UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLEAN CONVERSION TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> CLEANTECH BIOFUELS, INC., *et al.*, <br><br> Defendant. | Case No. 12-cv-239-L(JMA) <br><br> **ORDER DENYING DEFENDANT'S MOTION TO DISMISS [DOC. 14]** |

On January 30, 2012, Plaintiff Clean Conversion Technologies, Inc. ("CCT") commenced this action seeking injunctive relief and damages for alleged violations of the Sherman Act (15 U.S.C. §§ 1-2), the Clayton Act (15 U.S.C. § 18), the California Cartwright Act (Cal. Bus. & Prof. Code § 16720, *et seq.*), and California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200, *et seq.*). Defendant CleanTech Biofuels, Inc. ("CleanTech") now moves to dismiss the complaint.[1] CCT opposes.

The Court found this motion suitable for determination on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d.1). (Doc. 17.) For the following reasons, the Court **DENIES** CleanTech's motion.

---

[1] Defendant Steve Vande Vegte ("SVV") does not join in CleanTech's motion.

## I. BACKGROUND

### A. Pressurized Steam Classification ("PSC") Conversion

CleanTech is a Delaware corporation engaged in the business of producing cellusitic biomass from municipal solid waste. (Compl. ¶ 85.) CCT is a Washington corporation and CleanTech competitor in the PSC conversion market. (*Id*. ¶¶ 1, 102–05.)

"PSC conversion is used to convert solid, contaminated municipal waste . . . into certain kinds of usable commercial materials—specifically, various kinds and types of ferrous metals, non-ferrous metals, plastics, glass, and usable biomass." (Compl. ¶ 14.) "Usable biomass in turn can be transformed into various commercial materials and other kinds of materials." (*Id.*) Without PSC conversion, a very substantial portion of contaminated municipal waste must be buried in landfills, incinerated, or only partially treated by other methods. (*Id.* ¶ 46.)

### B. Antitrust Allegations

Beginning in 2008, CleanTech set out to obtain all of the patented PSC conversion technology in existence at the time. (*See* Compl. ¶¶ 87–95.) In September 2008, CleanTech acquired Biomass North America Licensing, Inc. ("Biomass"), the owner of several important patent applications relating to PSC technology—the "Noll Patents"—at that time. (*Id*. ¶ 93.) This transaction gave CleanTech the rights to practice PSC technology described by several patents and patent applications, most importantly the technology described in several U.S. Patent Applications and their related Canadian Patent Applications. (*Id*.) In October 2008, CleanTech purchased another set of PSC patents—the "Eley Patents"—from World Waste Technologies, Inc. ("World Waste"). (*Id*. ¶ 94.) In both instances, CleanTech structured the transactions so that Biomass and World Waste would derive substantial profits by cooperating with CleanTech's attempted monopolization of the PSC conversion market. (*Id*. ¶ 97.) Furthermore, CleanTech's purchase of the Eley Patents from World Waste did not reflect the market value of the patents. (*Id*. ¶ 101.) Rather, CleanTech paid a huge premium in order to accomplish its goal of consolidating the PSC technology in one entity. (*Id*.)

//

After acquiring the Eley Patents, CleanTech allegedly put into motion a scheme to terminate the Master License Agreement for those patents so that it could corner the market for PSC conversion. (Compl. ¶¶ 96, 100.) However, the Eley Patents had already been exclusively licensed to one of CleanTech's competitors, Clean Earth Solutions. (*Id*. ¶¶ 98–99, 104.) Clean Earth Solutions and its exclusive license of the Eley Patents was one of the final impediments to CleanTech cornering of the PSC market. (*Id*.) Thus, immediately after CleanTech purchased the Eley Patents from World Waste, it set in motion a scheme to terminate Clean Earth Solution's exclusive license. (*Id*. ¶ 100.) Working with Vande Vegte, CleanTech allegedly conspired to have litigation initiated against Clean Earth Solutions to pressure it into giving up its rights to the PSC technology in the Eley Patents ("SVV litigation"). (*Id*. ¶ 103.) As a result of the debt load caused by the SVV litigation, Clean Earth Solutions sold its license under the Eley Patents to CCT. (*Id*. ¶¶ 1, 102–05.) Vande Vegte then used this transfer as a basis of another lawsuit filed against Clean Earth Solutions and CCT for fraudulent transfer.[2]

CleanTech seized the license transfer as an opportunity to attempt to terminate the license itself. (Compl. ¶ 106.) In March 2011, CleanTech's President, Ed Hennessey, approached CCT and stated that he "had talked with Steve Vande Vegte and can make this [State Court] lawsuit go away if you cooperate with me" in working together to market the PSC conversion technology. (*Id*. ¶¶ 106–07.) Based on the allegations in the complaint, it is unclear which state-court lawsuit Mr. Hennessey was referring to.

In September 2011, Mr. Hennessey and Vande Vegte contacted the original inventor of the PSC technology in the Eley Patents, Dr. Michael Eley, in an effort to convince him that he should participate in their attempt to monopolize the PSC market. (Compl. ¶¶ 100, 109.) Then, on November 10, 2011, Mr. Hennessey put in CleanTech's 10-Q filing that it was the company's

---

[2] Both parties refer to a second lawsuit between Vande Vegte and CCT in their moving papers even though this *vital* second lawsuit is not clearly alleged anywhere in the complaint. (*See* Def.'s Mot. 7:11–12; Pl.'s Opp'n 4:4–6.) CleanTech cites Paragraph 106 of the complaint, which only passingly mentions "concurrent litigation" against Clean Earth Solutions with no mention of CCT; CCT conveniently does not identify any allegation in the complaint that discusses the second lawsuit.

"intention to 'consolidate the ownership' of the intellectual property rights to PSC technology to corner the PSC market by excluding all other market participants." (*Id*. ¶ 108.)

CCT commenced this action on January 20, 2012, alleging claims against CleanTech for various antitrust violations. Specifically, CCT alleges CleanTech's "overall scheme" to monopolize the PSC market violated Sections 1 and 2 of the Sherman Act as well as conspiracy to monopolize under the same statute. (Compl. ¶¶ 114, 124.) Additionally, CCT brings suit under the Clayton Act, the California Cartwright Act, and California's UCL. (*Id*. ¶¶ 131, 140, 144.)

## II.  LEGAL STANDARD

The court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court must accept all allegations of material fact as true and construe them in light most favorable to the nonmoving party. *Cedars-Sanai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). Material allegations, even if doubtful in fact, are assumed to be true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, the court need not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotation marks omitted). In fact, the court does not need to accept any legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, — , 129 S. Ct. 1937, 1949 (2009)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). Instead, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct.

at 1949 (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

## III.   DISCUSSION[3]

CleanTech moves to dismiss CCT's complaint on three grounds: (1) CCT lacks standing to pursue its antitrust claims because it fails to allege an antitrust injury; (2) litigation between CCT and Vande Vegte cannot serve as the basis for this action because the litigation is privileged under the *Noerr-Pennington* doctrine and California's absolute litigation privilege; and (3) CCT fails to allege "market power" under the Sherman Act. The Court will address each argument below.

### A.   Standing

Only those plaintiffs who meet the requirements for "antitrust standing" may pursue a claim under the antitrust acts. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999). To have antitrust standing, a plaintiff must adequately allege "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999). The Ninth Circuit has defined antitrust injury as injury to the process of competition and

---

[3] CleanTech claims that CCT's opposition was untimely. (Def.'s Reply 6:23–28.) This argument is completely baseless and frivolous. Based on the May 7, 2012 hearing date for this motion, CCT's opposition was due April 23, 2012. CleanTech concedes that that is indeed the due date for the opposition. The docket shows that CCT filed its opposition on April 23, 2012. (Doc. 20.) Accordingly, the Court rejects CleanTech's claim and will consider CCT's opposition in assessing the merits of CleanTech's motion.

consumer welfare. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008); *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1997) (citing *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983)). The plaintiff therefore must show more than injury to itself as a competitor, "but rather injury to the competition." *Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir. 1992). In addition, to have antitrust standing a plaintiff must be a "participant in the same market as the alleged malefactors." *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 373 (9th Cir. 2003) (internal quotation marks omitted). "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services[,] or a competitor of the alleged violator in the restrained market." *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987).

CleanTech contends that CCT lacks standing to pursue its Sherman Act and Cartwright Act claims because "[t]here is no antitrust violation for intending to enforce legitimate patents rights" and CCT fails to allege an antitrust injury. (Def.'s Mot. 6:23–7:6.) CleanTech does not elaborate much on the former except to add that "CCT could not suffer an antitrust injury arising from CleanTech enforcing its patent rights." (*Id.*) It does, however, elaborate a bit more on the latter, contending that "termination of the license agreement under which CCT intended to use the Eley Patents is not a basis for antitrust injury," and "[n]either is the purported litigation against CCT[.]" (*Id.*) CCT responds that it properly alleges its standing, identifying allegations throughout the complaint that purportedly show an antitrust injury. (Pl.'s Opp'n 7:19–8:16.)

To begin, CCT alleges that it participates in the business of producing cellustic biomass as a licensee of PSC technology. (Compl. ¶¶ 85, 102, 110, 121, 133, 139.) From these allegations, the Court can reasonably infer that CCT is a participant in the same market as CleanTech. *See Glen Holly Entm't*, 352 F.3d at 373.

Moving on, CCT alleges harms that are precisely the type that antitrust laws were designed to prevent. Specifically, it alleges that but for the conspiracy to completely eliminate CleanTech's competition in the market for PSC conversion technology, there would be participants other than CCT who could provide competitive bids and options to consumers. (Compl. ¶ 101, 121, 133.) CCT also alleges that CleanTech's conspiracy suppressed, eliminated,

and interfered with competition and continues to do so through a scheme of strategic litigation, market manipulation, and back-room agreements to manipulate market participants out of the market—including CCT—and disrupt the natural competition in the relevant market for PSC conversion technology and services. (*Id.* ¶ 102.) Further, the complaint includes allegations that CleanTech's conduct produced various anticompetitive effects including: (a) adversely affecting competition in the market for PSC technology and services (*id.* ¶ 110), (b) increasing prices in the PSC market (*id.* ¶ 114), (c) monopolizing the market related to municipal waste by PSC conversion (*id.* ¶ 121), and (d) raising the barriers to entry into the PSC market (*id.* ¶ 122). CCT does not allege that it suffered antitrust injury from CleanTech's enforcement of its patent rights. Rather, CCT alleges that it, as well as the market as a whole, suffered an injury to competition as a result of CleanTech's effort to conspire to consolidate the market and monopolize the market power into one entity. (*Id.* ¶¶ 110, 113, 120, 121, 122, 133, 136, 137.)

Accordingly, the Court finds that CCT properly alleges an antitrust injury and thus has standing to pursue its antitrust claims. *See Austin*, 979 F.3d at 739.

### B. Market Power

In order to state a valid claim under the Sherman Act, a plaintiff must allege both that a "relevant market" exists and that the defendant has power within that market. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). CCT brings one of its antitrust claims under § 1 of the Sherman Act, which governs restraint of trade and tying, and another under § 2 of the Sherman Act, which governs monopolization and attempted monopolization. The "relevant market" and "market power" requirements apply identically under these two sections of the Sherman Act. *Id.* at 1044 n.3. CleanTech does not challenge CCT's Clayton Act claim. And though antitrust law requires allegations of product market, a geographic market, and harm to competition, CleanTech does not challenge any of CCT's allegations related to those requirements. *See id.* at 1045. Rather, CleanTech only challenges the sufficiency of CCT's market-power allegation. Thus, that is the issue that the Court will address below.

"Market power is the ability to raise price profitability by restricting output; when a party has sufficient market power to exclude competition or control prices, that party possesses monopoly power." *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1136 (9th Cir. 2010) (citation and internal quotation marks omitted). Market power need not be pled with specificity, and whether a defendant actually possesses market power is a factual question. *Newcal*, 513 F.3d at 1045, 1051. A plaintiff may plead market power through allegations of direct evidence showing the effects of anticompetative behavior, or indirect evidence of market power. To demonstrate market power indirectly, a plaintiff must define the relevant market, and show that (1) the defendant has a dominant share of that market, and (2) that there are significant barriers to entry and existing competitors lack the capacity to increase their output in the short run. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (the "barriers to entry" test looks at not only whether "there are significant barriers to entry [but also whether] . . . existing competitors lack the capacity to increase their output in the short run"). Additionally, to bring a claim for attempted monopolization, rather than pleading monopoly power, a plaintiff may plead a "dangerous probability" that the defendant may be able to achieve monopoly power. *Newcal*, 513 F.3d at 1044 n.3.

CleanTech argues that "the only allegation of market power is that CleanTech holds the Eley Patent and Noll Patent," and there are no other allegations to support any antitrust violations regarding those patents. (Def.'s Mot. 11:11–17.) It contends that CCT's Cartwright Act claims fail for the same reasons. (*Id.* at 11:18–12:6.) In response, CCT argues that "it alleges facts sufficient to support an indirect inference that Cleantech possesses market power in the PSC market," identifying allegations throughout the complaint to support its argument. (Pl.'s Opp'n 10:18–11:3.)

As briefly discussed above, CCT adequately alleges that the relevant market here is the PSC conversion market. (*See* Compl. ¶¶ 85, 102, 110, 121, 133, 139.) CCT also alleges that CleanTech has taken action to remove competitors from that market in order to dominate it. (*Id.* ¶¶ 93–97, 100–02, 113–14, 121–23, 133, 136–37.) Specifically, CleanTech acquired both competing patents, the Eley patents and Noll patents, concerning the PSC conversion process in

the United States with the intent to "consolidate the ownership" of the intellectual-property rights to the PSC technology in order to corner the PSC market by excluding all other market participants. (*Id.* ¶¶ 95–97, 108–10.) A prime example of this exclusionary behavior is CleanTech's alleged attempt to exclude CCT—the *only* licensee under the Eley Patents—from the PSC market by terminating a license agreement that granted CCT rights to use the Eley Patents. (*Id.* ¶¶ 98–106.) This type of exclusionary behavior also constitutes a substantial barrier to entry into the market for any company considering developing its own offering of PSC services. (*See id.* ¶¶ 72, 77.) Additionally, CCT alleges that in a market which already maintains high entry costs in research, development, and manufacturing of the equipment, it is unlikely that there will be additional entry into the PSC market as a result of CleanTech's behavior. (*Id.* ¶ 122.) From these allegations, the Court can reasonably infer that CleanTech has indirect market power in the PSC conversion market, and that there is a "dangerous possibility" that CleanTech may be able to achieve monopoly power.[4] *See Rebel Oil*, 51 F.3d at 1439.

      Finally, CleanTech's argument regarding patent rights and market power are misguided. Contrary to CleanTech's contentions, CCT does not allege that CleanTech obtained its patents through fraud on the Patent Office. Moreover, CCT is not a patent-infringement plaintiff and is not alleging that as a part of CleanTech's conspiracy to monopolize the PSC market that CleanTech improperly maintained infringement actions against CCT. Instead, CCT alleges that CleanTech, through its conspiracy with Vande Vegte, attempted to consolidate market power in one entity, wrongfully terminated at least one patent, and created artificially high barriers to entry into the PSC market. (Compl. ¶¶ 112-16, 119-22, 133, 136-37.) Therefore, the Court rejects CleanTech's argument that this action is a matter of patent-enforcement rights.

---

[4] The Cartwright Act is California's antitrust law that "was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). Accordingly, "[t]he analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright . . . was modeled after the Sherman Act." *Id*. (citations omitted). Therefore, because CleanTech's argument against CCT's Cartwright Act claim is predicated on the insufficiency of CCT's Sherman Act claims, CleanTech also fails to show that CCT's Cartwright Act claim is insufficiently pled as well.

### C. *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine protects activities by parties to influence government policy or legislation for antitrust claims. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965). The doctrine nominally began as a judicially-created limitation on the scope of the Sherman Act with respect to activities by parties to petition the government to take a certain course of action beneficial to them and harmful to competitors. *See, e.g., Noerr*, 356 U.S. at 135. The doctrine has since been extended to protect those who petition for other forms of governmental actions. *See, e.g., Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) (administrative and judicial proceedings); *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365 (1991) (municipal ordinances). The doctrine has also been expanded to include litigation to protect rights such as patents. *See Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). The *Noerr-Pennington* doctrine protects "not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit.'" *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934-35 (9th Cir. 2006). The Ninth Circuit has held that "communications between private parties are sufficiently within the protection of the Petition Clause to trigger the *Noerr-Pennington* doctrine, so long as they are sufficiently related to petitioning activity." *Id.* at 935.

CleanTech contends that the litigation between Vande Vegte and CCT—which the Court again emphasizes is not alleged in the complaint—does not fall within one of the recognized circumstances to lose *Noerr-Pennington* protection, and thus the litigation is protected by the doctrine. (Def.'s Mot. 8:21–25.) CCT responds that the litigation is not protected by the *Noerr-Pennington* doctrine because references to the litigation do not involve "petitioning activity that falls under the *Noerr-Pennington* umbrella." (Pl.'s Opp'n 12:17–25, 18:17–14:12.) CleanTech appears to challenge an allegation that it characterizes as stating that "Clean Tech conspired with SVV to engage in litigation against CCT to monopolize the relevant market." (Def.'s Mot. 7:11–12.) However, the application of the *Noerr-Pennington* doctrine appears to substantively center around the allegation that "CleanTech's president, Ed Hennessey manifested the

Defendants' intent to manipulate and conspire to monopolize the PCS [sic] market when he told CCT on March 3, 2011, that he 'had talked with Steve Vande Vegte and can make this [State Court] lawsuit go away if you will cooperate with me' in working together to market the PSC conversion technology."[5] (Compl. ¶ 107.)

CCT refers to litigation only in that Mr. Hennessey, CleanTech's president, used it at leverage to attempt to compel CCT to "work[] together to market the PSC conversion technology." (*See* Compl. ¶ 107.) But based on the allegations in the complaint, Mr. Hennessey does not appear to be party to the SVV litigation or the litigation between Vande Vegte and CCT; the SVV litigation is between Vande Vegte and Clean Earth Solutions (*id.* ¶ 103), and the unalleged second litigation appears to be between Vande Vegte and CCT. And though at first glance the offer seems to be for some sort of settlement, that would be an inaccurate characterization because Mr. Hennessey is not a party to either litigation, and thus he lacks the authority to make the lawsuit "go away."

More importantly, CleanTech puts the cart before the horse. Litigation is only implicated in order to support an alleged scheme to violate antitrust law. CleanTech does not, however, provide any substantive analysis as to whether the *Noerr-Pennington* doctrine even applies. It neither specifically identifies any petitions sent directly to the court in the course of nor any conduct incidental to the prosecution of the either litigation. *See Sosa*, 437 F.3d at 934-35. Rather, CleanTech merely starts its analysis from the presumption that the doctrine applies, and then goes on to argue that the unalleged litigation between Vande Vegte and CCT does not fall within the "sham" exception. (*See* Def.'s Mot. 7:15–19, 7:20–8:25.) CleanTech has not shown that it is entitled to the benefit of such a presumption. Simply put, CleanTech fails specifically identify any petitioning activity, and also fails to show that either litigation is entitled to *Noerr-Pennington* protection. Therefore, without more, the Court cannot conclude that either litigation

---

[5] Though it is unclear which litigation that the "State Court lawsuit" refers to, the analysis below applies to both the SVV litigation and the unalleged second lawsuit between Vande Vegte and CCT.

is protected by the *Noerr-Pennington* doctrine.[6]

### IV. CONCLUSION & ORDER

In light of the foregoing, the Court **DENIES** CleanTech's motion to dismiss. (Doc. 14.)

**IT IS SO ORDERED.**

DATED: August 20, 2012

_____
M. James Lorenz
United States District Court Judge

COPY TO:
HON. JAN M. ADLER
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL

---

[6] CleanTech further moves to dismiss CCT's UCL claim on the grounds that it is barred by California's absolute litigation privilege. "The usual formation is that the privilege applies to any communication (1) made in judicial or quasi judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve objects of the litigation; and (4) that have some connection or logical relation to the action." *People v. The Pac. Lumber Co.*, 158 Cal. App. 4th 950, 958 (2008) (internal citations and quotation marks omitted). CleanTech fails to identify any communication or action that falls under this protection. Therefore, the Court rejects CleanTech's absolute-litigation-privilege argument.